**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| DAVID M. ANTHONY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-3252 |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff David Anthony appeals from a final decision of the Social Security Administration (SSA) denying his application for supplemental security income (SSI) and disability insurance benefits (DIB) under sections 216(I), 223(d), and 1614(a)(3)(A) of the Social Security Act.  See 42 U.S.C. §§ 416(I), 423(d) & 1382c(a)(3)(A).  Anthony brings this appeal pursuant to 42 U.S.C. § 405(g).  The parties have consented to a determination of the case by a United States Magistrate Judge, pursuant to 28 U.S.C. § 636. Order, April 30, 2010 (d/e 11).  The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  Brief in Support of Complaint (d/e 10) (Plaintiff's Brief); Motion for Summary Affirmance (d/e 14).  For the reasons set forth below, Anthony's request for

summary judgment is denied, and the SSA's request for summary

affirmance is allowed.

## STATEMENT OF FACTS

A.    Medical History

Anthony was born July 15, 1977.  Answer (d/e 8), Attachments 3 - 12,

Administrative Record (A.R.) at 14.[1]  He attended twelfth grade, but did not

graduate from high school.  A.R. at 42-43.  He lives with his girlfriend and

his two children.  He was in a car accident on July 16, 2003, during which

he sustained injuries to his back, neck, and head.  A.R. at 21-22.  Anthony

was hospitalized for four days following the car accident.  A.R. at 307.

Treatment notes indicate that Anthony lost consciousness and suffered an

impact seizure at the scene of the accident.  When he arrived at the

hospital, Anthony was agitated and combative.  As a result, he was

"sedated, paralyzed, and intubated."  Id.  He was admitted to the intensive

care unit under continued sedation, where he continued to improve.  CT

scans of Anthony's brain were normal.  Anthony was slow to ambulate, but

by the time he was released from the hospital, he was ambulatory with

some assistance and minimal complaints.  Discharge instructions directed

_____

[1]The Court will cite to the Administrative Record by the consecutive Bates stamp
numbers which appear on the lower right hand corner of each page.

Anthony to refrain from working or driving and to follow up in one week. X-rays of Anthony's spine taken July 26, 2003 were normal, as was an electroencephalogram (EEG) performed July 28, 2003. A.R. at 303-06.

On August 21, 2003, Anthony saw Kurt Heimbrecht, M.D. A.R. at 182. Dr. Heimbrecht noted that CT scans and x-rays following the accident were negative and that Robert Kraus, Jr., M.D. had released Anthony to return to work. Anthony reported a left sided headache that did not respond to prescribed ibuprofen and tingling and shaking in his right hand and feet. Anthony stated that his leg gave out occasionally and he did not feel able to return to work at Speed Lube. Anthony also reported stuttering more than previously, a little bit of memory loss, and a little bit of left-sided neck pain. Dr. Heimbrecht noted no appreciable stuttering and a supple neck. Dr. Heimbrecht's assessment was mild memory loss and headache. Dr. Heimbrecht extended Anthony's work note, directing that Anthony should not work until seen again. He referred Anthony to a neurologist, ordered more physical therapy, and directed follow up in two weeks.

Anthony saw Dr. Heimbretch again on September 8, 2003. A.R. at 181. Dr. Heimbretch noted that the stuttering and tingling were better, but Anthony still experienced occasional headaches. Anthony reported a fair

amount of fatigue, lower back pain, and heartburn.  Dr. Heimbretch

directed Anthony to continue with physical therapy and to follow up in two

weeks.  Dr. Heimbretch anticipated that Anthony would be released to work

at that time, but noted that he was not quite up to work yet.

On September 22, 2003, Anthony saw Dr. Heimbretch and asked if

he could go back to work.  A.R. at 178.  Anthony reported seeing Dr.

Ahmed, who changed his medications.  Anthony also reported occasional

shaking in his hand, that did not affect his handwriting.  Anthony stated that

he was experiencing neck pain, and Dr. Heimbretch noted a tentative

diagnosis of whiplash.  Dr. Heimbretch noted that Anthony exhibited a good

range of motion in the neck and right shoulder, however, he concluded that

Anthony "could very well" be suffering from whiplash.  Id.  Dr. Heimbretch

directed Anthony to continue on his current medications and to follow up in

three weeks.  A work note was given.  An EEG performed September 24,

2003 was normal.  A.R. at 302.  An MRI performed October 1, 2003 was

also normal.  A.R. at 301.  Radiographs of the cervical spine showed disc

dessication and small herniations.  A.R. at 299-300.

On October 16, 2003, Anthony reported to Dr. Heimbretch that Dr. Ahmed wanted him to be off from work for another two months. A.R. at 179. Dr. Heimbrecht noted that Anthony still had a little bit of a limp and that most of his symptoms were not much better. Dr. Heimbretch assessed Anthony as suffering from neck pain and abdominal pain, although he noted that Anthony's neck was supple. Dr. Heimbretch issued a work note and directed follow up in two months.

Anthony saw Dr. Heimbretch again on December 17, 2003. A.R. at 176. Anthony reported that he had to take a day off from work due to severe lower back pain. Dr. Heimbretch noted that Anthony "continues to have low back pain especially when it's cold weather. Even gets a headache." Id. Dr. Heimbretch released Anthony to return to work with no overhead work, ladder use, or climbing.

On April 2, 2004, Anthony returned to see Dr. Heimbretch, complaining of abdominal pain for three weeks. Dr. Heimbretch noted that Anthony's shoulder was "getting better," but that he occasionally took Aleve. A.R. at 177. Dr. Heimbretch opined that Anthony may have an ulcer that could be the result of non-steroidal anti-inflammatory medicine.

He directed Anthony to discontinue using Aleve.  On April 28, 2004, Anthony saw Dr. Heimbretch for a hemorrhoid.  A.R. at 175.

On June 10, 2004, Anthony saw Dr. Heimbretch complaining of lower back pain that began five days prior and abdominal pain.  A.R. at 173. Anthony reported that he had been to the emergency room for the back pain, where he received a pain shot that helped briefly.  Anthony also reported that he had been working at Speed Lube.  Dr. Heimbretch concluded that Anthony had suffered a simple low back strain which should resolve on its own.

An ultrasound of Anthony's abdomen, performed on August 19, 2004, was normal.  A.R. at 298.  Anthony presented to the emergency room on August 20, 2004, complaining of lower back pain.  A.R. at 294-96.  Anthony reported that the back pain had flared up about one week prior.  Anthony sought a note excusing him from work for a while.  The doctor ordered Anthony off work for the next day only and directed him to follow up with Dr. Heimbretch early the next week.

Anthony returned to the emergency room on August 29, 2004, again complaining of lower back pain.  A.R. at 291-92.  Treatment notes indicate that Anthony stated that he had difficulty returning to work due to back

pain.  The doctor told Anthony that, if he wanted disability paperwork, he needed to see his primary care doctor.  At this point, Anthony stood up, took off his gown, swore about the poor care in the hospital, and left.  The emergency room doctor's notes indicate "I never had the chance to examine the patient."  A.R. at 291.  Anthony visited Dr. Heimbretch on August 30, 2004.  A.R. at 172.  Anthony reported "more back pain ever since working in the pit area at Speed Lube" and that the pain was such that he could not do more than lie down when he gets home from work.  Id.  Dr. Heimbretch's notes indicate that Anthony "was told by a doctor in St. Louis (went there at the advice of his attorney) that he has a pinched nerve in his neck and a disc problem at L5-6.  There is no record of this."  Id.  Dr. Heimbretch noted some palpable lower  back tenderness, although a straight leg raise was negative, and that Anthony seemed to be frustrated.  Dr. Heimbretch issued Anthony a work note and suggested that Anthony consider epidural steroid injection.

In November 2004, Anthony saw David Gregory, M.D., as a new patient. Anthony was seeking a referral to the Sarah Bush Lincoln Health Center physician's pain clinic.  A.R. at 357-58.  Dr. Gregory noted that Anthony's neck was supple, and a straight leg raise was negative

bilaterally.  Dr. Gregory noted obvious limited range of motion in Anthony's lower back, secondary to pain.  At a follow up in January 2005, Anthony reported abdominal pain, headaches, blurred vision and a lot of shaking in his right hand.  A.R. at 356-57.  By February 14, 2005, Anthony reported that his headaches were improved, but he complained of lower abdominal pain.  A.R. at 355.

At a follow up on May 16, 2005, Dr. Gregory noted that Anthony did not have any problems with his back pain but that his acid reflux was "bothering a lot."  A.R. at 353.  Dr. Gregory noted that Anthony was still working as a mechanic.  Id.  Anthony saw Dr. Gregory in July 2005, complaining of acid reflux and abdominal pain.  A.R. at 352.  Dr. Gregory's notes from the visit make no mention of back pain.  Anthony returned to see Dr. Gregory on August 3, 2005, for acid reflux, abdominal pain, and epigastric pain.  A.R. at 351.  Dr. Gregory noted that Anthony had a history of back pain.  Id.

On August 9, 2005, Anthony saw a physician's assistant for follow up on abdominal pain and headaches.  A.R. at 350.  Anthony also reported that he was experiencing some low back pain.  Id.  The physician's assistant noted mild tenderness to palpation bilaterally in Anthony's back,

but no spinal tenderness, bony abnormalities, bruising, or redness of the skin.  Id.  On August 11, 2005, Anthony saw another physician's assistant, complaining of sore throat, fever, and chills.  A.R. at 349-50.  The physician's assistant diagnosed strep throat and prescribed antibiotics.

In December 2005, Anthony returned to see Dr. Gregory for evaluation of left elbow pain and back pain.  A.R. at 348.  Anthony reported that he slipped at home and fell.  He had visited the emergency room, where x-rays were negative.  Anthony was taking Tylenol 3 and muscle relaxers, which he stated were "working fine."  Id.  Dr. Gregory noted "[c]ontusion to the left elbow and low back pain secondary to fall" and directed Anthony to continue with all chronic medications as well as the medications prescribed at the emergency room.  Id.

On July 5, 2006, Anthony was examined by Hima Atluri, M.D.  A.R. at 402-06.  Dr. Atluri noted that Anthony's grip strength was strong and equal bilaterally.  A straight leg raising test was abnormal, at not more than sixty degrees.  Anthony's back flexion was limited to sixty degrees, with extension less than ten degrees.  Dr. Atluri noted minimal tenderness in the lower lumbar area.  Side-to-side movements were less than ten degrees. Anthony exhibited a normal gait.  Dr. Atluri noted that Anthony experienced

moderate difficulty in walking on his toes and heels.  Dr. Atluri further noted that Anthony was unable to squat and arise or hop on one leg.  Dr. Atluri administered a "mini mental score examination."  A.R. at 406.  Anthony scored 21 out of 30, which correlated into mild cognitive impairment. Dr. Atluri noted the following diagnostic impressions: (1) lower lumbar pain with significant stiffness and abnormal straight leg raise, but no neurovascular compromise; (2) headache and memory problems; and (3) nicotine dependence.  A.R. at 405.

On August 4, 2006, Licensed Clinical Psychologist Stephen Vincent, Ph.D. performed a Mental Status Examination and IQ Assessment.  A.R. at 407-10.  Dr. Vincent noted noticeable tremors in Anthony's hands, which were evident at rest as well as upon voluntary movement.  A.R. at 407. Anthony reported that he had been laid off from Speed Lube in January 2006 due to problems with coworkers and supervisors, as well as difficulty maintaining the required pace of work.  Anthony informed Dr. Vincent that he was depressed and worried about his overall ability to care for himself due to chronic pain and fatigue.  Anthony reported that he hurt constantly and his memory was not as good as it used to be, making it difficult for him to finish tasks.  Anthony reported that his energy level was low and he had

to pace himself to avoid exacerbating his neck and lower back pain.

Dr. Vincent noted that Anthony's mood was mildly depressed and that his "[t]hought processes, although somewhat slow and concrete, were logical, coherent and relevant and quite consistent with the IQ data, placing him within the borderline range." A.R. at 408. Anthony exhibited difficulty spelling and was unable to do simple multiplication or division. Testing revealed a verbal IQ of 72, a performance IQ of 78, and a full scale IQ of 73. Dr. Vincent noted that Anthony was functioning within the borderline range of intellectual abilities. Dr. Vincent noted the following diagnostic impressions: (1) mood disorder secondary to general medical condition with major depressive-like features and (2) borderline intellectual functioning.

On August 25, 2006, Phyllis Brister, Ph.D. reviewed Anthony's medical records. A.R. at 411-28. She opined that Anthony suffered from borderline intellectual functioning and mood disorder. However, she determined that Anthony's impairments did not meet or equal any Listing. According to Dr. Brister, Anthony had mild limitation in activities of daily living, moderate limitation in maintaining social functioning, moderate limitation in maintaining concentration, persistence, or pace, and no

episodes of decompensation of extended duration.  A.R. at 421.  Dr. Brister completed a Mental Residual Functional Capacity Assessment for Anthony, noting moderate limitations in the following areas: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination with or proximity to others without being distracted by them; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  A.R. at 425-26.  Dr. Brister opined that Anthony retained the "ability to understand, recall and execute simple operation of a routine, repetitive nature.  Would do best in socially restricted setting.  Retains ability to adapt to routine.  Capable Simple [substantial gainful activity]."  A.R. at 427.

On August 30, 2006, Delano Zimmerman, M.D. reviewed Anthony's medical records and completed a Physical Residual Functional Capacity Assessment.  A.R. at 429-36.  Dr. Zimmerman opined that Anthony could lift fifty pounds occasionally and twenty-five pounds frequently, could stand and/or walk about six hours in an eight-hour workday, could sit about six

hours in an eight-hour workday, and perform unlimited pushing and/or pulling.  Dr. Zimmerman opined that Anthony could frequently balance, kneel, and crawl, but only occasionally climb ramps, stairs, ladders, ropes, or scaffolds, stoop, and crouch.  Dr. Zimmerman noted no manipulative, vision, or communicative limitations, but noted that Anthony should avoid concentrated exposure to hazards.

Anthony began treatment with chiropractor Dr. John Warrington on February 1, 2007.  A.R. at 442-459.  Dr. Warrington referred Anthony to Jay Riseman, M.D. for pharmaceutical management as co-treatment with his physical therapy.  On May 4, 2007, Dr. Warrington wrote a letter, opining that Anthony suffered from spondylolistheses and degenerative disc disease.[2]  He stated as follows: "Anthony's impairment is extensive and permanent.  His impairment will be more than 12 months.  He cannot engage in substantial gainful employment at this time."  A.R. at 442.

On August 7, 2007, Anthony saw Edward Trudeau, M.D. for evaluation of Anthony's upper left extremity.  A.R. at 461-65.  Dr. Trudeau noted that Anthony had many problems from head to toe and was depressed about his inability to work.  A.R. at 461.  Anthony reported

---

[2]Spondylolisthesis is a condition involving displacement of a vertebra.

discomfort up and down his left arm and pain in his back and lower extremities.  Dr. Trudeau performed electrodiagnostic studies of Anthony's left upper extremity.  Dr. Trudeau noted the results as follows:

> <u>Detailed</u> nerve conduction studies in the left upper extremity were normal, fortunately for Mr. Anthony.  <u>Detailed</u> needle electromyographic examination of the left upper extremity revealed irritability, occasional positive waves, increase in polyphasia of motor unit potentials and decrease of motor unit potential number at maximal interference pattern in left posterior interosseous innervated muscles.  Other muscles were normal, fortunately for Mr. Anthony.

A.R. at 462 (emphasis in original).  Dr. Trudeau diagnosed mild posterior interosseous neuropathy in Anthony's left forearm and noted that there was no evidence of other entrapment neuropathy, left cervical radiculopathy, or left brachial plexopathy.   A.R. at 464.

Anthony saw Cecile Becker, M.D., a neurologist, on September 21, 2007.  A.R. at 470.  According to Dr. Becker, Anthony exhibited some mild degenerative disc disease, which should not lead to any impairment.  Dr. Becker opined that Anthony "can engage in substantial gainful employment without difficulties."  Id.

In November 2007, Anthony saw Mark Greatting, M.D., for evaluation following surgical intervention for left radial tunnel syndrome/posterior intcrosseous nerve entrapment.  A.R. at 472-73.  Anthony reported that the

pain he experienced prior to the surgery had resolved. Dr. Greatting noted that Anthony exhibited good range of motion and good strength. Dr. Greatting opined that Anthony had no permanent impairment or disability from the radial tunnel syndrome/posterior intcrosseous nerve entrapment and concluded that Anthony could use his left arm without restriction or limitation.

Anthony underwent a neuropsychological evaluation with Karen Lee, Psy. D., in June and July 2008. A.R. at 475-81. Dr. Lee noted that Anthony had significant cognitive deficits. A.R. at 476. Anthony had a verbal IQ score of 66, a performance IQ score of 72, and a full scale IQ score of 65. These verbal and full scale scores were classified as "Extremely Low," while the performance score was "Borderline." Dr. Lee diagnosed cognitive disorder, moderate major depressive disorder, and mild mental retardation. Dr. Lee assigned Anthony a Global Assessment of Functioning (GAF) score of 50.[3] Dr. Lee noted that certain barriers existed regarding Anthony's anticipated return to work, including the following:

---

[3]GAF is an assessment of an individual's overall level of psychological, social and occupational functioning which is used to make treatment decisions. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32 (4th ed. 2000). Scores range from 0 to 100, with lower numbers indicating more severe mental limitations. Id. at 34. Scores ranging from 41 to 50 indicate serious symptoms or serious impairment in social, occupational, or school functioning. Id.

severely impaired ability to pay attention and concentrate, significant deficits in memory and learning, below average ability to comprehend what he hears, poor frustration tolerance, difficulty with anger control, and extremely low IQ.  A.R. at 480.  Dr. Lee noted that Anthony also possessed several strengths that would be helpful for a return to work including: a stated desire to work, a willingness to learn, an ability to do well with praise and encouragement, a pleasant attitude when not under stress, and a supportive significant other.  Id.    Dr. Lee recommended that Anthony complete a job analysis with vocational rehabilitation professionals to determine what, if any, jobs Anthony could perform.  Dr. Lee also recommended that Anthony participate in job retraining and job shadowing. Dr. Lee noted that, if job trials fail, Anthony should look into the possibility of disability benefits.

### B.   Administrative Proceedings

Anthony filed his application for SSI and DIB on May 17, 2006, with an alleged onset date of January 7, 2006.  A.R. at  47-50.  Anthony's claim was denied initially and on reconsideration.  Anthony requested an administrative hearing, which was held February 6, 2009. A.R. at 17-46. Anthony appeared with counsel.  At the hearing, the Administrative Law

Judge (ALJ) heard testimony from Anthony, Anthony's girlfriend Eva Hankins, and vocational expert Mr. Hammond as set forth below.

Anthony testified that he sustained major head trauma, major back injuries, and a pinched nerve in his neck as a result of the July 2003 car accident. Anthony stated that he was paralyzed on the right side of his body and could hardly walk. A.R. at 22. At the time of the car accident, Anthony was employed at Speed Lube, where he had worked for seven years as a "pit man" changing oil. A.R. at 22. Anthony was off of work for a period of time due to injuries from the accident, but returned to work at Speed Lube in October 2004. After returning to Speed Lube, Anthony worked four or five months, but left because he could not do the work. Specifically, Anthony stated that he could not understand the computers or stand on ladders. Anthony stated that his problems with memory and understanding resulted from his head injury.

Anthony testified that he had not worked since leaving Speed Lube in approximately March or April 2005. Anthony tried to get jobs, but experienced difficulty understanding and filling in applications. Anthony further testified that, approximately six months prior to the hearing, he began experiencing a trembling in his right hand. A.R. at 24. Anthony

explained that when he would become nervous, upset, or frustrated, his hand would tremble "real bad" and that the trembling could last for hours. Id. Anthony testified that Dr. Riseman had not been aware of the trembling in the hand, but was familiar with Anthony's problems with concentration and frustration.

Anthony testified that he experienced headaches two to three times a week. A.R. at 25-26. Anthony explained that he would get bad pains on the left side of his head, in the area where he sustained trauma in the accident. Pain medication provided no relief from Anthony's headaches; when experiencing a headache, Anthony would need to lie down and go to sleep. A.R. at 26. Anthony also experienced pain in his back and legs after standing for long periods of time.

Anthony testified that he hardly did anything around the house or yard. He stated that he did the dishes every now and then and vacuumed. On a typical day, Anthony gets up about 7:00 a.m. and gets his nine-year-old daughter and twelve-year-old son ready for school. After the children leave for school, Anthony lies down again until about 11:00 a.m. Anthony watches television and fixes his own lunch. Anthony spends most of his time in the afternoon watching television. Occasionally, Anthony fixes

supper, if his girlfriend is at work. Anthony testified that he cannot make a large meal and that it is hard for him to cook when his hand is trembling. When asked about hobbies, Anthony stated that he used to work on cars, but did not currently have any hobbies. Anthony testified that he did not attend church or visit friends. Anthony explained, "I just stay in the house." A.R. at 30. Anthony testified that he did not read and could hardly help his children with their homework. A.R. at 31. Anthony stated that he would go to the grocery store occasionally, but that often his girlfriend would accompany him because he could no longer calculate in his head like he used to be able to do. Anthony testified that he did go fishing on occasion. A.R. at 34.

Anthony testified that, in addition to his work at Speed Lube, he had done janitorial work in the past. Anthony stated that he could not do any type of janitorial work at the present, explaining as follows: "I can't stand up for hours at a time. I get very, very irritated. I get frustrated easy. I really don't like being around and trying to force myself a lot of work on myself. I don't like being in pain anymore." A.R. at 30. Anthony stated that he had

been very sociable before his accident, but now people frustrate him sometimes, and he wants to be alone at those times.

In response to questioning by the ALJ, Anthony testified that he drove occasionally, with the last time being November 2008. Anthony also stated that the medication that Dr. Raff prescribed helped with the shaking in his right arm. A.R. at 33.

Anthony's girlfriend Eva Hankins testified that she and Anthony had been together for sixteen years and had lived together since they were seventeen years old. Hankins stated that Anthony was different following his car accident, specifically that he had trouble remembering things. A.R. at 36. According to Hankins, Anthony did not do much around the house and did very little in the yard. Hankins testified that Anthony has had problems reading since the accident and experiences "really, really bad mood swings." A.R. at 37. Hankins stated that Anthony could become really angry, both at her and in general. Hankins also testified that Anthony experienced headaches that lasted three to four hours as well as constant pain in his back.

Hankins stated that Anthony had recently begun experiencing trembling in his right hand. According to Hankins, Anthony would

experience very noticeable trembling approximately five times per week and that the trembling sessions could last all day. Hankins reported that the trembling had stayed about the same with the medication from Dr. Raff. Hankins stated that Anthony's depression and anxiety medication made a difference, however, noting that when he does not take the medication Anthony "just blows up." A.R. at 40. When asked whether Anthony socialized, Hankins responded that they had recently moved and, given the cold weather, had not been able to meet people yet. She stated that Anthony did call people on the telephone, however. Hankins confirmed that Anthony no longer worked on cars after the accident, noting that he was not able to bend over and get underneath a car to do work on it.

Vocational expert Mr. Hammond also testified. The ALJ asked Hammond to assume a younger individual with the following restrictions: no ladders, ropes, or scaffolds; only occasional climbing, balancing, stooping, kneeling, crouching, and crawling; no concentrated exposure to unprotected heights or unprotected hazardous machinery; limited to unskilled work with one- or two-step operations that is not regarded as very stressful; no significant memorization; and only mild or slight interaction with others. Hammond testified that such an individual could perform work

at the light level as an ironer in the laundry trades or a production assembler.  According to Hammond, neither of these positions would allow for a sit/stand option, but rather required a minimum of six hours standing. Hammond further testified that such an individual could perform work at the sedentary level as a lens glass assembler or a semi-conductor bonder. Hammond characterized the semi-conductor bonder position as sit/stand at liberty.  With respect to the lens glass assembler position, Hammond explained that an individual could alternate from one position to another approximately every thirty to forty-five minutes.  Hammond testified that the production assembler, the lens glass assembler, and the bonder positions all required fine finger activity and gross hand movement.

On February 26, 2009, the ALJ issued an opinion denying Anthony's request for SSI and DIB.  A.R. at 5-16.  The Appeals Council denied Anthony's request for review on July 24, 2009.  A.R. at 1-3.  Anthony then filed his Complaint (d/e 1) in the instant action.

C.    The ALJ's Decision dated February 26, 2009

In reaching the conclusion that Anthony was not disabled, the ALJ followed the five-step analysis set out in 20 C.F.R. §§ 404.1520 & 416.920. The analysis requires a sequential evaluation of (1) whether claimant is

engaged in substantial gainful activity; (2) the severity and duration of claimant's impairment; (3) whether the impairment equals a listed impairment in 20 C.F.R. Pt. 404, Subpart P, Appendix 1; (4) whether the impairment prevents claimant from doing his past relevant work; and (5) whether claimant can perform other work, given his residual functional capacity, age, education, and work experience. The claimant has the burden of presenting evidence and proving the issues on the first four steps. The SSA has the burden on the last step; the SSA must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

The ALJ determined that Anthony met his burden on the first two steps of the analysis. The ALJ found that Anthony had not engaged in substantial gainful activity since January 7, 2006. A.R. at 10. The ALJ also determined that Anthony suffered from "the following severe impairments: disorders of the back, headaches, borderline intellectual functioning, mood disorder secondary to the claimant's general medical condition, and cognitive disorder." Id. The ALJ found that this combination of

impairments more than minimally impacted Anthony's ability to perform basic work activity.  Id.

At step three, the ALJ concluded that Anthony's impairments were not severe enough to equal an impairment listed on Appendix 1.  A.R. at 10-11.  The ALJ expressly considered Listing 1.04 for disorders of the back, but noted that Anthony failed to demonstrate positive straight leg raising in the seated or supine positions.  He also considered Listings 12.02, 12.04, and 12.05 for mental impairments, but determined that Anthony's mental impairments did not meet these listings.  In reaching this conclusion, the ALJ determined that Anthony had moderate restriction in activities of daily living; moderate difficulty in social functioning; moderate difficulty in concentration, persistence, or pace; and no episodes of decompensation of extended duration.

The ALJ determined that Anthony retained the residual functional capacity (RFC) to perform unskilled sedentary work with one- to two-step operations subject to the following restrictions: can only occasionally climb, balance stoop, kneel, crouch, or crawl; must avoid concentrated exposure to unprotected hazardous machinery; can never climb ladders, ropes, or scaffolds; cannot perform work that requires significant memorization; and

can have only slight interaction with people in the workplace.  A.R. at 11-12.

At step four, the ALJ found that Anthony's current RFC was significantly less than the RFC required for his past relevant work; thus, the ALJ determined that Anthony had no past relevant work.  A.R. at 14.  The ALJ then correctly shifted the burden to the Commissioner to show that Anthony retained the RFC to perform work existing in significant numbers in the national economy.  A.R. at 15.   Anthony qualifies as a younger individual under the Social Security Act.  Although he has a limited education, he is able to communicate in English.  The ALJ noted that the Medical-Vocations Guidelines (the Grids) suggest a finding of "not disabled" for an individual such as Anthony, who could perform the full range of sedentary work.  A.R. at 15; 20 C.F.R. pt 404, subpt. P, app. 2. The ALJ recognized that Anthony had additional limitations that impeded his ability to perform the full range of unskilled sedentary occupations. However, relying on the vocational expert's testimony, the ALJ determined that jobs exited in the national economy that Anthony could perform.  The ALJ identified lens glass assembler as a representative occupation and noted that this job exited in significant numbers in the state and national

economies.  Thus, the ALJ determined that Anthony was "not disabled" at step five.  Id.

ANALYSIS

This Court will reverse the decision of the SSA if that decision is not supported by substantial evidence or results from an error of law.  Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).  This Court reviews the ALJ's factual findings to determine whether they are supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The issue before this Court is whether the ALJ's findings were supported by substantial evidence and not whether Anthony is disabled.  Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003). The ALJ must at least minimally articulate his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).   The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).  This

Court must not reweigh the evidence and should affirm as long as the ALJ "identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion."  <u>Giles ex rel. Giles v. Astrue</u>, 483 F.3d 483, 486 (7th Cir. 2007).  If, however, "the ALJ's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  <u>Id</u>. (internal quotations and citation omitted).

Anthony seeks reversal of the SAA's decision, arguing (1) the ALJ failed to give appropriate weight to the opinion of treating chiropractor Dr. Warrington; (2) the ALJ erred in failing to evaluate or explain the weight accorded to Dr. Lee's report; (3) the ALJ erred in determining that Anthony's mental impairments failed to satisfy Listing Nos. 12.02 or 12.05; and (4) the ALJ erred in refusing to hold the record open for the submission of additional medical records.  The Court addresses each of these arguments in turn.

### 1.  Opinion of Treating Chiropractor Dr. Warrington

Anthony asserts that the ALJ committed reversible error in granting more weight to the opinion of consultant Dr. Becker than that of treating chiropractor Dr. Warrington.  On May 4, 2007, Dr. Warrington noted that

radiographs revealed spondylolistheses and degenerative disc disease. A.R. at 442. Dr. Warrington opined that Anthony's impairment was "extensive and permanent" and that Anthony could not engage in substantial gainful activity. Id. In September 2007, neurologist Dr. Becker noted, after an examination of Anthony and review of his medical records, that Anthony exhibited some mild degenerative disc disease, which should not lead to any impairment. Dr. Becker opined that Anthony could "engage in substantial gainful employment without difficulties." A.R. at 470.

In determining that Anthony retained the RFC to perform a limited range of sedentary work, the ALJ noted as follows:

> The undersigned is mindful of Dr. John Warrington's opinion that the claimant cannot engage in substantially gainful employment due to his back pain. However, this opinion does not appear to arise out of a functional capacity assessment. Indeed, other doctors have had differing opinions. Dr. Cecile Becker M.D. saw the claimant in September of 2007. Based on her examination, she concluded that the claimant did not have evidence of a herniation or stenosis, but only a mild impairment at T12-L1 and L5-S1 that should not preclude employment. This opinion, coupled with the state agency findings, suggests that the claimant is not entirely precluded from all work activity.

A.R. at 13 (internal citations omitted).

As Anthony correctly notes, Dr. Warrington had been treating Anthony on an on-going basis for several months at the time he rendered

his opinion, while Dr. Becker examined Anthony one time and reviewed his medical records.  Under Social Security Regulations, a treating source's opinion regarding the nature and severity of an impairment is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence . . . ." 20 C.F.R. § 416.927(d)(2).  However, a statement by a medical source that the claimant is "disabled" or "unable to work" is not a medical opinion and does not mandate a finding of disability.  The determination of whether a claimant meets the statutory definition of disability is reserved to the SSA, and the opinion of a medical professional on this issue is not given "any special significance . . . ." 20 C.F.R. § 416.927(e).

In the instant case, while Dr. Warrington opined that Anthony's impairment was "extensive and permanent" and that Anthony could not engage in substantial gainful activity, he failed to identify any specific functional limitations.  The ALJ did not err in failing to give Dr. Warrington's conclusory opinion as to Anthony's ability to perform substantial gainful activity controlling weight.  The ALJ reasonably considered other medical evidence, including Dr. Becker's conclusion that Anthony's mild

degenerative disc disease should not lead to any impairment, in determining that Anthony was not entirely precluded from work. Anthony's first claim of error fails.

## 2. Dr. Lee's Report

Anthony asserts that the ALJ erred in failing to evaluate or explain the weight accorded to Dr. Lee's 2008 neuropsychological report. According to Anthony, Dr. Lee's report indicates marked limitations in Anthony's ability to work from a mental perspective. Anthony argues that the lack of discussion of Dr. Lee's report prevents this Court from tracking the ALJ's analysis on this point and necessitates a remand.

The ALJ is not required to provide an in-depth analysis of every piece of evidence. Diaz, 55 F.3d at 308. However, the ALJ cannot ignore an entire line of evidence that is contrary to his disability determination. See Golembiewski v. Barnhart, 322 F.3d 912, 917-18 (7th Cir. 2003). The ALJ must minimally articulate reasons for rejecting or accepting specific evidence of disability so that the reviewing court can trace the path of his reasoning. Diaz, 55 F.3d at 307. The ALJ in the instant case expressly cited Dr. Lee's report in evaluating Anthony's physical limitations, noting

that Dr. Lee did not indicate any problem with a right hand tremor.

A.R. at 13.

While the ALJ did not expressly cite Dr. Lee's report again, he devoted a large portion of his opinion to consideration of Anthony's mental impairments and included limitations based on mental impairments in determining Anthony's RFC. A.R. at 11, 13-14. The ALJ recognized that Anthony placed in the borderline range of functioning in intelligence tests, but noted that Anthony could function independently and perform a variety of household tasks. A.R. at 14. The ALJ further noted that Anthony was able to function daily without significant treatment or assessment. The ALJ reasonably concluded that the record evidence did not support more than moderate limitation in Anthony's ability to perform daily activities or function socially. The ALJ also noted moderate limitation in Anthony's concentration and attention. As a result of these findings, the ALJ limited Anthony to unskilled work with 1-2 step operations, noted that Anthony could not perform work with required significant memorization, and limited Anthony to only slight interaction with people in the workplace.

A.R. at 11-12.

The ALJ was not required to specifically address Dr. Lee's report in detail.  The Court notes that Dr. Lee did not apply the regulatory severity ratings to specific functional limitations, and, in any event, the ALJ explained that, in his opinion, Anthony's reported activities were inconsistent with a finding that Anthony suffered from more than moderate mental functional limitations.  While the ALJ did not note Anthony's exact IQ scores, he recognized that the scores were low.  Again, the ALJ concluded that, despite the low IQ scores, the record evidence revealed that Anthony could function independently and perform a variety of household tasks.  Finally, the ALJ did not err in failing to discuss Dr. Lee's conclusion that Anthony had a GAF score of 50.  The ALJ is not required to specifically address GAF scores, which "are intended to be used to make treatment decisions, . . . not as a measure of the extent of an individual's disability."  Jaskowiak v. Astrue, 2009 WL 2424213, at *12 (W.D. Wis. Aug. 6, 2009); Mobley-Butcher v. Astrue, 2007 WL 3124478, at *11 (S.D. Ind. Sept. 6, 2007).  A GAF score in the range of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  American Psychiatric

Association, <u>Diagnostic and Statistical Manual of Mental Disorders, Text Revision</u> 34 (4th ed. 2000). However, despite assigning a GAF of 50, Dr. Lee did not opine that Anthony was unable to keep a job, but rather recommended a job analysis, job retraining, and job shadowing. Dr. Lee expressly noted that Anthony had both barriers and strengths relating to a return to work. A.R. at 480. The Court can track the ALJ's analysis, despite the lack of detailed discussion of Dr. Lee's report. Anthony's claim of error fails.

### 3. Applicability of Listing No. 12.02 and Listing No. 12.05 (C)

Listing No. 12.02 deals with organic mental disorders. Listing No. 12.05 deals with mental retardation. The ALJ concluded that Anthony failed to satisfy either listing. Anthony contends that this decision was erroneous.

Listing No. 12.02 is satisfied when the organic mental disorder meets the requirements in both 12.02 (A) and (B), or when the requirements in 12.02 (C) are satisfied. Anthony argues that his condition satisfies 12.02 (A) and (B), which provide as follows:

> A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

1. Disorientation to time and place; or
2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
4. Change in personality; or
5. Disturbance in mood; or
6. Emotional ability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.  The ALJ determined that

Anthony failed to meet § 12.02 (B).  As previously noted, the job of this

Court is not to reweigh the evidence, but rather to determine whether the

ALJ considered all of the important evidence and whether his decision was

supported by substantial evidence.

Anthony contends that the ALJ erroneously determined that he had only moderate restriction in activities of daily living; moderate difficulty in social functioning; and moderate difficulty in concentration, persistence, or pace. A.R. at 11. However, each of these conclusions is supported by record evidence, specifically, Dr. Brister's mental residual functional capacity assessment. A.R. at 425-27. Dr. Lee, upon whom Anthony relies, did not make any specific findings regarding any limitation in the areas set out in Listing No. 12.02 (B), nor did she opine that Anthony was unable to work. Instead, Dr. Lee recommended that Anthony complete a job analysis to determine what, if any, jobs he could perform and that Anthony participate in job retraining and job shadowing. A.R. at 480. The ALJ's determination that Anthony failed to satisfy the criteria in paragraph B of Listing No. 12.02 is supported by substantial evidence, and the Court can track the ALJ's analysis.

Listing No. 12.05 provides as follows:

Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Anthony argues that his condition satisfies 12.05 (C), which requires the following: "C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

In assessing Anthony's severe impairments, the ALJ determined that Anthony suffered from "borderline intellectual functioning" rather than mental retardation. A.R. at 10. This conclusion is supported by the record evidence. Both Dr. Vincent and Dr. Brister diagnosed borderline intellectual functioning. The record is devoid of a diagnosis of mental retardation with an onset before age 22. Dr. Lee's report, upon which Anthony relies, recognizes that the Diagnostic and Statistical Manual of Mental Disorders definition of mental retardation requires onset before the age of 18. A.R. at 478; American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 41 (4th ed. 2000). Dr. Lee noted that "[i]t is unknown at what point [Anthony's] cognitive skills became injured, or whether he was born with such a low IQ." A.R. at 478. Thus, the ALJ's determination that Anthony failed to satisfy Listing No.

12.05 (C) is supported by substantial evidence, and the Court can track the ALJ's analysis. Anthony's claim of error fails.

### 4. Request to Hold the Record Open for Additional Submissions

At the February 6, 2009 hearing, Anthony's attorney asked the ALJ to hold the record open for two weeks to allow Anthony to procure and submit records from a new medical provider, Dr. Raff. A.R. at 19. The ALJ asked how often Anthony had seen Dr. Raff, why he had seen him, and what type of information was likely to come from Dr. Raff. Anthony responded that he had seen Dr. Raff two times and Dr. Raff had prescribed Paxil for anxiety and another medication for shaking in Anthony's right arm. A.R. at 20. Anthony further reported that Dr. Raff was supposed to test him for Parkinson's disease. The ALJ, however, indicated that he doubted that a general practitioner would test for Parkinson's, noting that Anthony would probably be referred to a neurologist for testing. At the conclusion of the hearing, the ALJ stated that, based on the testimony relating to Dr. Raff, there were "no definitive tests undergoing." A.R. at 45. Thus, the ALJ saw no need for any additional submissions, and he deemed the record complete and closed. Id. Anthony asserts that this decision warrants

reversal because the use of his right hand was crucial to the determination that he could perform the work identified by the vocational expert.

"[T]he ALJ in a Social Security hearing has a duty to develop a full and fair record." <u>Nelms v. Astrue</u>, 553 F.3d 1093, 1098 (7th Cir. 2009). Courts in this circuit generally uphold the reasoned judgment of the Commissioner on how much evidence to gather. <u>Id</u>. The Seventh Circuit instructs that "an omission is significant only if it is prejudicial." <u>Id</u>. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand. Instead a claimant must set forth specific, relevant facts – such as medical evidence – that the ALJ did not consider." <u>Id</u>. (internal quotations and citations omitted). In the instant case, Anthony fails to establish that he was prejudiced by the ALJ's refusal to hold the record open. Anthony did not present the additional medical records from Dr. Raff to the Appeals Council or to this Court; thus, he offers only speculation that the additional information would have been relevant. The ALJ's refusal to hold the record open for additional submissions does not constitute grounds for remand.

<u>CONCLUSION</u>

THEREFORE, for the reasons set forth below, Plaintiff's Brief in Support of Complaint (d/e 10), which the Court construes as a motion for summary judgment, is DENIED, and the Motion for Summary Affirmance by Defendant Commissioner of Social Security (d/e 14) is ALLOWED. Judgement is entered in favor of Defendant Commissioner of Social Security and against Plaintiff David Anthony. All pending motions are denied as moot. THIS CASE IS CLOSED.

IT IS THEREFORE SO ORDERED.

ENTER: October 25, 2010

FOR THE COURT:


_____*s/ Byron G. Cudmore*_____
BYRON G. CUDMORE
UNITED STATE MAGISTRATE JUDGE